**UNITED STATES DISTRICT COURT**
**FOR THE**
**DISTRICT OF VERMONT**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| v. | ) | Case No. 2:24-cr-0098-wks-2 |
| PAUL CONNEH | ) | |
| DEFENDANT | ) | |

**PAUL CONNEH'S SENTENCING MEMORANDUM AND MOTION FOR DOWNWARD VARIANCE**

## I. INTRODUCTION

Paul Conneh has been charged in relationship to the "Grandparent Scam." As will be explained below, Paul was a minor actor in this international criminal organization that exists completely and totally independent of him. As will also be explained below, the Sentencing Guidelines range is completely inappropriate in this case, as it was in the case of other participants who have come before this Court.

Paul was a participant in this scheme for less than a month. Paul was recruited under the pretext of helping to find someone to collect gambling proceeds. Paul received a dictated 2.5% of money received. His involvement ended nearly as soon as it started. Paul never threatened anyone, he never interacted with any victim, he never confronted a victim.

While his decision-making was regretful, the Sentencing Guidelines and Government's recommendation are completely and utterly wrong. Paul is neither a leader nor organizer of this scheme, he was a fractional and inconsequential component of something that, admittedly, represents an incredibly serious problem. And for his brief participation, Paul's life has been turned upside down and levelled to the ground. Punishment is part of sentencing, but Paul has

unquestionably been punished enough. Additional time will not serve any legitimate goal of sentencing, and it will represent a great disparity when comparing the sentences of others. It would, ultimately, only serve to punish a small actor, while the scheme's organizational behemoths continue to loot the savings of the elderly.

By the Government's representations at the sentencing of co-defendants in this courthouse, this scheme has churned tens of millions of dollars for a sophisticated, international-based criminal enterprise that has operated long before Paul and which will continue unabated after this case is done.

The architects and long-term operators of this enterprise -- the call-center owners in Montreal, the organizers who ran this scheme for years before Paul's brief involvement and years after-- are not before this Court. What the Court has seen in sentencing Paul and others, is a rotating cast of recruited dupes, couriers, and short-term participants, each bearing a Guidelines calculation built for the career architects of a multi-million-dollar enterprise, not for the men and women who passed through it for weeks or months at a time.

Paul has already been punished beyond what is necessary in this case. For nearly a year, Paul was detained in Costa Rica, pending extradition, in conditions that can only be described as vile. Paul spent his days in an overcrowded cell, with dozens of violent offenders sharing a single toilet. Inadequate food, endemic violence, and a coercive extortion system were the reality of daily life. Few defendants have come close to the despicable and punishing conditions that Paul has endured. Compounding the experience of these despicable conditions, while helplessly detained in Costa Rica, Paul learned (as explained in detail below) that his mother had been diagnosed with stage 4 cancer.

Somehow, through all of this, however, Paul's behavior during nearly twenty months of pre-trial detention has been impeccable, with no disciplinary infractions, extensive educational programing, voluntary enrollment in substance-abuse programming, and full, timely acceptance of responsibility.

As set forth herein, substantial variances are appropriate in this family of cases, and this is particularly true here. Paul's history and characteristics favor a second chance, rather than extended punishment. Paul is a devoted son, brother, and friend with a demonstrated capacity for hard work, entrepreneurship, and legitimate achievement, all of which is corroborated by twenty-five (25) individual letters of support that accompany this memorandum.[1] (the "Support Letters" are set forth in the composite index and attached as exhibit A).

For all of these reasons, and as set forth more fully below, the defense respectfully submits that a sentence of time served (approximately twenty months of pre-trial custody) is sufficient, and indeed more than sufficient, to satisfy the purposes of 18 U.S.C. § 3553(a).

## II. BACKGROUND AND PAUL CONNEH'S PERSONAL HISTORY

Paul was born in Beijing, China, in 1987, to Maryse Courville, a French-Canadian linguist, interpreter, and later provincial government official, and a Liberian father who worked at the country's embassy in Beijing. His multicultural origins meant that, from his earliest years, Paul was immersed in multiple languages and cultures. The family returned to Canada before Paul's first birthday. When he was three, his mother's work took the family to Tunis, where Paul attended the American School and, by age seven, he could already speak French, English, and Arabic.

---

[1] The Court will note that some of the letters are redacted. There are a myriad of factors that have led to legitimate fears of intervening in this case. The defense has provided redaction where requested and out of respect for the concerns raised by certain individuals who have written from Canada.

While his culturally rich background was a blessing in certain respects, it was an altogether too common albatross in others. When the family returned to Montreal, Paul was greeted by ugliness and racism he encountered at school. He was mocked and humiliated by classmates for his mixed heritage, and his family lived under constant financial pressures. Paul's mother and father separated when he was young, and his mother operated as a single parent throughout his upbringing. Paul was, by every account submitted to this Court, the emotional and practical center of his small family. Paul had a supportive family, but from an early age he felt pressure, financially and emotionally, to make sure that everyone was cared for, and he rose to that challenge, whether he was ready for it or not.

Paul's sister, Mia Courville-Todorov, describes a brother who, from boyhood, was "the man of the family, the strongest pillar" of a small household that had little money, went through a divorce, and lived with mental illness in the home. (Letters of Support Pgs. 1-3). Paul was eleven when Mia was born. From the moment she was born, Paul took care of her, "feeding me, bathing me, changing my diapers." As she grew up, he watched her while their parents worked, made sure she ate and did her homework, and taught her to ride a bike. While still a teenager, he took it on himself to provide for her. He brought home groceries for family meals, made sure his sister "had new clothes for school, thoughtful birthday and Christmas gifts," and bought his mother flowers "for every occasion." Only as an adult did she come to understand "the pressure he must have carried, taking on the responsibility of providing when he was still a child himself." She describes holidays that, for Paul, meant "long drives, difficult episodes of mental illness in our family, and the little money we had to make it all happen," burdens she believes he deliberately hid from her to protect her. His protectiveness was also physical. When a pot of oil caught fire while the two were making supper, he carried the burning pot out of the house, saving their home but suffering

second-degree burns in the process. She remembers him as the center of every family dinner, "always making everyone laugh, leading discussions," and writes that "to this day, many things in our home, from our appliances to the clothes I wear, are there because of him." His absence has left the family without its anchor. Even now he puts her first. He talked her out of making the ten-hour drive to visit him in Vermont so she would be spared the trip and the border crossing.

Despite leaving high school before completing his diploma, Paul later returned to his studies with determination, earning his GED at the New Brunswick Community College, finishing at the top of his class, and going on to complete a bachelor's degree in Civil Engineering Technology in 2015, during which he served as his class's student representative. Paul worked hard to elevate himself from the relatively poor circumstances that he encountered growing up in Lavalle, Quebec.

In the years before his arrest, Paul was building a legitimate import-export business that showed real promise. During the COVID-19 pandemic, he sourced and imported hundreds of thousands of masks and medical protective gloves for Canadian airlines and pharmacies at a time when such supplies were critically short. By 2023, he had pivoted to building materials and consumer goods, attending the Canton Fair in Guangzhou with his mother, developing supplier relationships in flooring, windows, furniture, and sanitary equipment, and incorporating a company in Hong Kong through which he was shipping orders to Canada, the Caribbean, Africa, and Europe. He relocated to Guangzhou to pursue this business, and by the fall of 2024 his mother had joined him there, spending what she describes as one of the happiest periods of her life watching her son build something of his own. (Letters of Support Pgs. 4-6).

It was against this backdrop, unfortunately, that Paul, in the summer of 2023, made the catastrophic decision to assist in what he was told was a gambling-money-moving operation. It

was not the choice of a career criminal. It was a brief and inexcusable lapse of judgment by a man with a real future, made worse only by the fact that it interrupted a life that was, by every other measure, moving in the right direction.

## III. THE BACKGROUND OF THE OFFENSE: A BRIEF, LOW-LEVEL ROLE IN A VAST INTERNATIONAL SCHEME

The Grandparent Scam charged in this and in the related proceedings was not Paul's invention. His participation in it represents a vanishingly small fraction of its lifespan. The scheme preys upon people's weaknesses, including the low-level participants who, like Paul, are often introduced to the scheme under false pretenses.

The Government's sentencing submissions (in related cases) recount that this particular criminal enterprise -- with call centers based in and around Montreal -- took in more than $21 million from victims across the United States over a 67-week period alone. In the related case of David Leblanc, the sentencing record establishes that he was recruiting participants and receiving victim data from Canadian call centers as early as February 2020.

Philippe Alvarez, Mr. Conneh's co-defendant, operating under the codename "Jimmy Tea," was the organizing force of this particular unit. (See September 23, 2026 Pre-Sentence Report at ¶¶'s 18-23, hereafter cited by paragraph number as "PSR __"). He communicated directly with the call centers, received the personal information of victims, and directed the movement of money. Alvarez's cousin, Jean Richard Audate, had already been arrested once for participating in this same scheme before Paul ever became involved. In sum, it is important to note, there are myriad layers involved in this organization, and like so many criminal organizations, its existence relies upon involving low-level participants who will provide a buffer and insulating wall from the true organizers.

In 2023, Alvarez approached Paul, explaining that he was looking for someone who could help pick up money in the United States. (PSR ¶18(a)). Paul understood that scams are pervasive in the Montreal area. Paul was not told, and did not initially understand, that this was such a scheme involving grandparents and the elderly. (PSR ¶ 18(a)). It was only as his brief involvement progressed that he became aware the money to be picked up was, in fact, the proceeds of a "grandparent scam" preying on elderly Americans. While the Government will no doubt argue that Paul withdraw only because of serious disruption (the capture and arrest of a fellow participant, "Individual 2" in the U.S.), the truth is that Paul wanted nothing to do with the Grandparent Scam, and he left the scheme despite the fact that the group owed some very dangerous people $80,000.00 after the co-defendant's arrest.[2]

There is a profound and legally significant difference between the person who stands at the door of a frightened eighty-year-old woman and exploits her love for her grandchild, and the person who – initially believing he is helping move gambling proceeds (as Paul initially did) -- sets up a communication channel, and extricates himself from the arrangement shortly after the truth becomes known. Both are wrong, but they are not the same kind of wrong. The law recognizes that distinction in the degree of moral culpability and as reflected in the weight differing roles must carry under 18 U.S.C. § 3553(a)(1), (2).

Paul's actual role was that of a remote intermediary. He helped facilitate the recruitment of a courier -- Individual #2, later identified as Derek Lyons a/k/a "Mav," (PSR ¶ 19) -- who physically traveled to Rhode Island, Vermont, and Maine to collect cash from elderly victims. Paul created and administered a Telegram group chat through which Alvarez relayed victim information and instructions to Lyons. Alvarez collected the money, and Paul was then responsible

[2] The defense is unaware of the current whereabouts of this co-defendant, but believes that he was allowed to return to reside and continue employment in Canada.

for arranging payment to his fellow participants through prepaid debit cards loaded into PayPal accounts. (PSR ¶ 18(c), (f)). Paul never traveled to the United States. He never met, called, or communicated with a single victim. He never saw a victim's face or heard a victim's voice. His entire participation was virtual, conducted from Canada, and it was compensated at a small, fixed percentage dictated to him by Alvarez and by extension, the higher ups. Paul's share was not negotiated or controlled; it was a set rate from above, consistent with his role as a low-level, replaceable participant rather than a stakeholder in the enterprise.

The substantive conduct of Paul spans a period of approximately one month, in July and August of 2023, the period during which Lyons traveled to New England and collected the funds at issue. (PSR ¶ 18(d)). That brief window is the entirety of Paul's culpable conduct in an enterprise that, as set forth above, has operated for years on either side of it.

This Court has heard the Government describe, in related sentencing proceedings, the particular cruelty of a scheme that exploits an elderly victim's love for a grandchild -- the cold call, the false arrest story, the demand for secrecy, the stranger at the door collecting cash from a frightened, isolated victim. That cruelty is real, and it is the cruelty of the courier standing at the victim's door and those who specifically designed this scheme around emotional vulnerability. It is not the cruelty of a remote intermediary in Canada who believed, until partway through a month window, that he was helping move gambling money.

Paul does not offer this distinction to excuse his conduct. He was wrong to continue his participation once he understood its true nature, and he has said so. He offers it because the distinction is real, and it must inform this Court's assessment of a sentence that is "sufficient but not greater than necessary."

## IV. MR. CONNEH'S PRE-TRIAL DETENTION INVOLVED 10 MONTHS OF INHUMANE CONDITIONS IN COSTA RICA, FOLLOWED BY EXEMPLARY BEHAVIOR IN U.S. CUSTODY

Mr. Conneh was arrested in Costa Rica on January 23, 2025, pursuant to an Interpol Red Notice. (PSR ¶¶1, 2) He was not extradited to the United States until December 3, 2025. (PSR ¶ 4). He appeared in this District on December 5, 2025, (PSR ¶ 5), and has remained detained continuously since that date, now at the Essex County Jail in Lewis, New York.

By the scheduled date of sentencing, October 5, 2026, Mr. Conneh will have spent approximately twenty months in pre-trial custody. That period alone exceeds the sentence imposed on five of the seven co-defendants sentenced in this and related cases (described in Part V below) and it does not include any credit for the extraordinary conditions under which Paul has already served. It is, in short, already greater than necessary to achieve the goals of sentencing set forth at 18 U.S.C. §3553(a).

For almost a year, pending extradition, Paul was held in a Costa Rican detention facility, under conditions that are intolerable by any measure, culminating in confinement to a concrete room filled with 35 prisoners sharing a single toilet. Paul's fellow-inhabitants were part of a tightly controlled hierarchy of criminals, with an outsider like Paul at the very top of bottom of that hierarchy.

Paul has described his arrest and the terrible conditions in a detailed, extensive narrative to this Court (attached as Exhibit B), and his account is backed up by independent reporting (See The Tico Times, *"A look inside Costa Rica's San Rafael Prison,"* August 25, 2015, attached as Exhibit C). Paul was housed in an overcrowded pod, at a maximum-security facility. There were not enough beds, and so many men, including Paul, slept on the floor. A coercive "allowance" system required inmates to pay other prisoners on a biweekly basis or face retribution. Violence and

intimidation were endemic. Paul spoke only limited Spanish, and repeated efforts by his family to send him a dictionary through counsel were unsuccessful, leaving him to navigate a linguistically isolating and physically dangerous environment alone for nearly a year.

These are not the ordinary discomforts of pre-trial detention. Costa Rica's own prison oversight body, the Ombudsman's National Mechanism for the Prevention of Torture, has formally found conditions in the country's overcrowded penitentiary system to constitute a human-rights violation, with some facilities holding nearly double their designed capacity and cellblocks with as few as one toilet per hundred inmates. (*A Look Inside Costa Rica's San Rafael Prison*, pg. 2). Paul's first-hand account of what he endured is entirely consistent with that documented, systemic reality.

District courts within the Second Circuit have long recognized that harsh conditions in? confinement bear directly on the "sufficient but not greater than necessary" inquiry under 18 U.S.C. § 3553(a). *See United States v. Colucci*, 743 F. Supp. 3d 452, 461-462 (E.D.N.Y. 2024) (reflecting upon the conditions of confinement at MDC Brooklyn, and outlining the reasons that unduly harsh conditions can support a reduced sentence under §355(a)(1)(A). *See also United States v. C*arty, 264 F.3d 191, 196 (2d Cir. 2001) (holding that "pre-sentence confinement conditions may in appropriate cases be a permissible basis for downward departures.") If courts can account for substandard conditions at federal facilities operating under BOP oversight, conditions of the severity described here (in a facility outside any federal or state correctional system) warrant greater scrutiny from this Court in deciding upon just punishment.

Once transferred to the United States, Paul has embraced every opportunity given to him, done everything he can to better himself, and he has been a model inmate. Paul has not incurred a single disciplinary infraction. While at Northwest Correctional, Paul secured a job working five

times a day to clean the unit. He took every course available to him, gaining 47 education credits that he earned over hundreds of hours of study.[3] After his change of plea, Paul was transferred to the Essex County Jail in New York. Although the opportunities were more limited, he has continued to abide by all rules and he has taken advantage of the available programming. Since his transfer to the United States, Mr. Conneh has voluntarily enrolled in substance-use disorder programming at the Essex County Jail, working with counselor Dennis Furushima. He has engaged meaningfully with that counseling moving, in Mr. Furushima's words, past an initial period of denial to a genuine recognition that his past drinking had become "more problematic than what he initially thought." (See correspondence from counselor Dennis Furushima, attached as Exhibit D).

The Court is presented with the undeniable record of a man using an exceptionally difficult period of confinement to confront his own conduct honestly, and to work toward genuine rehabilitation.

Paul has written a letter to this Court (attached at Exhibit E). The defense will let the correspondence speak for itself, but needless to say, while his experience has been incredibly harsh, the period of reflection has resulted in everything that should be seen in a rehabilitated defendant.

## V. THIS COURT'S SENTENCING RECORD DEMONSTRATES THAT SUBSTANTIAL VARIANCES ARE WARRANTED IN THIS AND SIMILAR CASES

This Court has sentenced multiple related defendants arising from this same enterprise, and additional participants remain pending sentencing or under indictment (PSR ¶ 9). From the outset,

[3] These courses were taken at the Northwest Correctional Facility, using the "EDOVO" system. After Paul was transferred to the Essex County Jail, he lost access to this system. Repeated efforts at obtaining these records have been unsuccessful, but the defense will update this filing if/when the certificates are received.

this underscores that the enterprise predates and postdates Paul's brief involvement, and it operates completely independent of him. More, in every single case, the Court has recognized the appropriateness of a downward variance in sentencing. The table below summarizes that sentencing history and the comparison with Paul's requested sentence.

| **Defendant** | **Role** | **Guideline Range** | **Sentence Imposed** |
|---|---|---|---|
| **Paul Conneh (proposed)** | Remote intermediary/payer; approximately 4 weeks of involvement | **108–135 mo. (PSR ¶ 75); 41–51 mo. (defense calc. below)** | **Time served (~20 mo. requested)** |
| Melisa Charles | Courier ("bail bondsman"); two-count plea | 121–151 months | 6 months |
| William Comfort | Courier ("bail bondsman"); 13 cities | 108–135 (135–168 w/ enhancement) | Time served (~30 mo. pretrial) |
| Enmanuel Castillo | Recruiter/coordinator | 57–71 (70–87 w/ enhancement) | 24 months |
| Zavier Buchanan | Courier; multi-year participant. | 97–121 (121–151 w/ enhancement) | 21 months |
| Alejandro Garcia | Courier | 46–57 (57–71 w/ enhancement) | Time served |
| Jean Richard Audate | Safe house/launderer; breached cooperation agreement & reoffended. Multi-year participant | 108–135 months | 30 mo. consecutive to remaining 16 months on RI sentence |
| David Leblanc | Recruiter/leader; multi-year, direct call-center pipeline | 121–151 months | 37 months |

Several of these comparisons warrant particular emphasis.

Jean Richard Audate's case is, in a very real sense, this Court's most instructive comparison. Audate was first prosecuted in the District of Rhode Island for participation in this same Grandparent Scam, involving more than $1.2 million in losses, and he was sentenced to 30 months in that Rhode Island case. While that case was pending -- prior to sentencing, and while he was purportedly cooperating with the government -- Audate res*umed his participation in the identical scheme*, this time causing more than $408,000 in additional losses in Rhode Island, Vermont, and

Maine. As a two-time offender, who participated with full knowledge of the depths of the scheme and its victims, Mr. Audate was sentenced to an additional 30 months (essentially 46 months, when considering the time left on his consecutive Rhode Island sentence). If a defendant who violated a cooperation agreement and resumed the identical fraudulent conduct received 30 months on a Guidelines' range of 108 to 135, there is no principled basis for imposing more than time-served on Paul, who never breached any agreement, who has suffered under cruel and unusual conditions of confinement, and who has been detained without incident for nearly twenty months already (on the identical 108-to-135-month Guidelines range).

Similarly, the Government's sentencing materials describe David Leblanc as a multi-year leader of this enterprise who personally recruited other participants, maintained a direct pipeline to the Canadian call centers, and collected between $2.5 and $3 million in proceeds, with his activity tracing back to February of 2020. Mr. Leblanc received a sentence of 37 months.

Zavier Buchanan was charged with collecting between $2.5 and $3 million as a courier over multiple years. Facing a 97-to-121-month guideline range (121 to 151 with the government's requested enhancement), Buchanan received 21 months.

Melisa Charles, who like Paul pled to a two-count structure (wire fraud conspiracy and money laundering conspiracy), faced a 121-to-151-month guideline range and received 6 months.

Not one of these defendants had the combination of mitigating factors present here. Paul's role was limited to a matter of weeks. His participation was remote and had no contact with victims. He entered the scheme under a materially false understanding of its nature. He has endured nearly a year of documented, extraordinarily harsh pre-trial detention abroad, and he has maintained a spotless disciplinary record throughout. If this Court's consistent practice of substantial downward variance extends to a cooperator who reoffended, it plainly extends to Paul.

Sentencing consistency is not the only factor, however, in Paul's favor. As discussed below, Paul presents with all the hallmarks of a positive trajectory moving forward.

## VI. MR. CONNEH'S CHARACTER, FAMILY DEVOTION, AND PROSPECTS FOR REHABILITATION

Again, submitted herewith are twenty-five (25) letters of support from family members, longtime friends, and professional associates spanning Canada, China, and the United States. The volume alone is extraordinary. Their substance is equally impressive. As above, the Court can see that Paul has worked diligently to lift himself up from difficult circumstances, and he extends that desire to elevate others. The accompanying letters provide individualized, detailed, recounts of how Paul has consistently, over his lifetime, forged positive relationships, and lifted others in the same manner that he lifted himself. A professional associate who worked with Paul in Guangzhou recounts that he refused payment for helping her locate suppliers, insisting he "simply wanted to help." A friend of more than two decades writes that "what has always stood out to me most about Paul is that he is a man of his word." A childhood friend describes him driving an hour out of his way to help with an emergency. A longtime friend who knew him through his return to school calls his experiences with Paul as, literally, changing the entire course of his life. (Letters of Support Pgs. 15-32).

Paul's mother, Maryse Courville, provides one of the most powerful submissions before this Court. In May of 2025, with her son in the depths of a Costa Rica maximum prison, Maryse was diagnosed with stage 4 breast cancer. (Letter of Support Pg. 7). She lost consciousness in June, she was moved to hospice, and she was not expected to survive. Miraculously, she did survive, and returned home after more than four months of hospitalization. The Court can imagine the tremendous mental and emotional toll all of this took on the family, but also the helplessness that they felt with Paul being imprisoned during this time.

Mia describes the year since his arrest as among the hardest of her life, managing their mother's cancer diagnosis, treatment, and hospitalization largely alone. "All I wanted was for him to be there," Mia writes, "and it felt like the greatest hardship that, during one of the most difficult trials our family has faced, we had to go through it without our main pillar." (Letters of Support Pgs. 3-4). Not surprisingly, Maryse's only want is "to hold [Paul] in my arms once again before I die." (Letters of Support Pg. 8).

Paul is now 39 years old. He has demonstrated, repeatedly, across every domain of his life, the capacity to set a goal and achieve it through discipline. He has a family that will welcome him, support his reintegration, and hold him accountable. He has professional and entrepreneurial skills that translate directly to legitimate employment. He has, by every account before this Court, the insight and the motivation to make good on the restitution he has agreed to pay and atone for the mistakes he has acknowledged.

Paul has always strived to improve his lot in life, as well as that of his family and friends. What the Court can see against this backdrop and the current charges, is not a peculiar circumstance, but rather a common circumstance of someone who grew up exposed to people, places, and things that tolerate poor behavior. As Paul has said throughout (and as recounted in the PSR), scamming is a part of the culture where he grew up. This is not to excuse it, it is only to help explain how someone with Paul's life skills, drive, and moral compass became entwined with it. It is an unfortunately common circumstance, but it was properly addressed with severe punishment he has already endured, combined with a chance to rejoin his family and society.

## VII. SENTENCING GUIDELINES: CONTESTED ENHANCEMENTS

The PSR calculates a total offense level of 31, with a base offense level 27 under USSG §§ 2X1.1(a), 2S1.1, and 2B1.1, a four-level vulnerable-victim adjustment under USSG §

3A1.1(b)(1)–(2), and a three-level manager/supervisor adjustment under USSG § 3B1.1(b). In conjunction with Criminal History Category I, this yields an advisory Guidelines range of 108 to 135 months. (PSR ¶ 75). By letter dated September 15, 2026, defense counsel objected to three of the applied enhancements (PSR Addendum at 26–29), and the government separately objected to the non-inclusion of a fourth enhancement (PSR Addendum at 25–26). The Probation Office rejected all four objections in its written responses. Defense counsel's objections are addressed below and, regardless of their technical application, the subjective inappropriateness of the Guidelines highlights the need for a variance sentence under § 3553(a).

**A. Sophisticated Laundering, USSG § 2S1.1(b)(3) (+2)**

The PSR attributes the sophisticated-laundering enhancement to Mr. Conneh based on the conversion of fraud proceeds into cryptocurrency and back into Canadian currency. But that conduct (as the PSR's own offense narrative makes clear) was performed entirely by Jean Richard Audate, who "aggregated and stored proceeds of the scam and then delivered the cash to a cryptocurrency exchanger." (PSR ¶ 20). Paul's own conduct, once the funds had already been converted back into cash by Alvarez, was limited to purchasing ordinary prepaid debit cards and loading them into consumer PayPal accounts. These payment mechanisms are available to literally anyone with a smartphone. They are a far cry from the offshore accounts, shell entities, and layered transactions that USSG § 2S1.1 cmt. n.5(A) identifies as being the hallmarks of sophisticated laundering. Applying this enhancement to Paul, whose only financial role was distributing already-converted cash through PayPal, cannot be reconciled with the intended scope of the Guidelines.

**B. Vulnerable-Victim Enhancements, USSG § 3A1.1(b)(1)–(2) (+4)**

The four-level enhancement under § 3A1.1(b)(1)-(2) requires a finding not merely that the victims were elderly, but that the particular defendant knew or should have known of their unusual

vulnerability. *United States v. O'Neil*, 118 F.3d 65, 75 (2d Cir. 1997) ("In determining vulnerability, we focus not on the likelihood or extent of harm to the individual if the crime is successful, but on the extent of the individual's ability to protect himself from the crime.") Paul never spoke with a victim. He received no information about a given victim's emotional state, physical or mental condition, and he was induced into the scheme upon false pretenses. There is no evidence that Paul was aware of any unusual vulnerability, and because § 3A1.1(b)(2) applies only if § 3A1.1(b)(1) applies, neither enhancement should apply. Again, while Paul recognizes the morally repugnant nature of the scheme and he repudiates it, the Guidelines' enhancement cannot stand in these circumstances.

**C. Manager or Supervisor, USSG § 3B1.1(b) (+3)**

The manager/supervisor enhancement requires more than coordination with others, which is a feature of virtually every conspiracy count ever charged. Paul participated for a matter of weeks, in exchange for a fixed, small percentage of proceeds dictated to him from above, alongside a handful of other similarly low-level participants, within an enterprise that has existed for years before his involvement and years after it. To apply a three-level role enhancement on this record -- particularly where the government's own materials describe David Leblanc, a multi-year recruiter with direct access to the Canadian call centers, as warranting only a two-level enhancement -- would render the manager/supervisor distinction meaningless.

**D. Guidelines Conclusion: A Variance Sentence is Necessary on These Facts**

Regardless of whether or not the Court ultimately imposes these enhancements, the defense posits that they only serve to illustrate how the Sentencing Guidelines have strayed from their original mandate. Rather than targeting the actual organizational structure (well financed, international kingpins who run this and other scams), they are ensnaring individuals who perform

high-risk, low-reward, small-level tasks with exposure that sophisticated participants avoid. The Guidelines' inappropriate results are on full display here, where the Court is confronted with a one-month participant, brought to the offense under false-pretenses and upon the paltry promise of a 2.5% share. In short, a variance and sentence applying the factors at 18 U.S.C. §3553(a) is appropriate.

## VIII. APPLICATION OF 18 U.S.C. § 3553(a) DICTATES A VARIANCE AND TIME-SERVED SENTENCE IN-LINE WITH OTHER PARTICIPANTS WHO HAVE BEEN SENTENCED IN THIS SCHEME

The offense is serious, and the victims of this scheme deserve this Court's full acknowledgment of the harm they suffered. But Paul's own role in causing that harm was limited in ways that are both legally and morally significant. Paul's participation was brief in duration, remote in execution, undertaken initially under a false understanding of its nature, and compensated at a fixed, dictated rate rather than with a negotiated share of the profits.

Paul has a record of legitimate entrepreneurship and academic achievement built against real adversity. He has a family and community that describe him, with remarkable consistency across twenty-five letters, as generous, loyal, and dependable. Paul grew-up surrounded by a culture of scams, and predictably, this likely normalized his perception of it. His mistakes have come with an extremely heavy price already.

In Costa Rica, Paul suffered under conditions that are intolerable by any reasonable measure. Paul shared a concrete room with cartel-connected detainees. He was forced to abide by and conform to strict and violently enforced hierarchical structures, in a language he barely understood, all with no access to actual plumbing, and while his mother battled stage 4 cancer.

The defense cannot put a number on the credit that Paul should receive for that period of incarceration, but it is certainly not merely a "day for a day" calculation. In fact, the defense credibly posits that Paul has already been punished too much.

Following his trials in Costa Rica, Paul's pre-trial detention has, again, been exemplary, with meaningful participation throughout and absolutely no disciplinary record. Specific deterrence has plainly been achieved. Paul has engaged in substance-abuse programming, accepted responsibility promptly, and incurred no disciplinary infractions across nearly two years of confinement.

Deterrence is already served by the felony conviction itself, the substantial restitution obligation, and the brutal pre-trial confinement and continuing confinement during which he was separated from his terminally ill mother.

A sentence of time served sentence (approximately twenty months) falls squarely within the range of outcomes this Court has imposed on similarly and more culpable co-defendants, from 6 months (Charles) to 37 months (Leblanc), with a defendant who breached a cooperation agreement and reoffended receiving 30 months (Audate). A sentence materially above that range, would create the unwarranted disparity § 3553(a)(6) is designed to prevent.

Mr. Conneh has agreed to pay not less than $256,000 in restitution to the identified victims of this scheme, and he is committed to fulfilling that obligation. A sentence that allows him to return to gainful employment promptly, rather than one that extends his incarceration for many additional months, better serves, not undermines, the victims' interest in actually being made whole.

Paul Conneh is not defined by a month-long lapse of judgment in the summer of 2023. Paul has demonstrated a record of resilience, generosity, and legitimate achievement. His family has

been devastated by his absence and desperately needs him home. With nearly twenty months of pre-trial custody already served, roughly half of it under conditions that courts have recognized can themselves warrant a variance. A sentence far below the advisory guideline range is entirely appropriate.

Paul has already endured conditions of custody that far exceed what § 3553(a) requires for a participant of his limited role and brief involvement. He asks this Court for the opportunity to return to his family, and a chance to begin to rebuild his life and repay the restitution to which he has agreed.

## IX. CONCLUSION

For all of the foregoing reasons, Paul Conneh respectfully requests that this Court impose a sentence of time served, and order restitution at the agreed minimum of $256,000, joint and several with co-defendants as appropriate, with supervised release upon such terms as the Court deems just and proper.

Dated at Stowe, Vermont this 28th day of September 2026.

By: Counsel for Paul Conneh

/ s/ Chandler W. Matson
Chandler W. Matson
Barr Law Group, PLC
125 Mountain Road
Stowe, Vermont 05672
chandler@barrlaw.com
(802) 253.6272

## <u>CERTIFICATE OF SERVICE</u>

I, Chandler W. Matson, hereby certify that I electronically filed the above pleading with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the attorney of record for the Government, AUSA Nate Burris.

DATED AT Stowe, Vermont this 28th day of September 2026.

/s/ Chandler W. Matson
Chandler W. Matson
125 Mountain Road
Stowe, Vermont 05672
Chandler@barrlaw.com
(802) 253.6272
Counsel for Paul Conneh