UNITED STATES DISTRICT COURT
DISTRICT OF VERMONT

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>PAUL CONNEH, a.k.a. “Polo” and “Rickey Rozay,"<br>Defendant. | Docket No. 2:24-CR-98-2 |

**<u>SENTENCING MEMORANDUM OF THE UNITED STATES</u>**

The United States of America submits this memorandum to advise the Court at the October 5, 2026, sentencing of the defendant, Paul Conneh, a.k.a. “Polo” and “Rickey Rozay.” Conneh is a longtime, recidivist fraudster who has employed sophisticated tactics to evade detection while perpetrating various fraud schemes. In the instant case, Conneh participated in a “grandparent scam” by recruiting “bail bondsmen” to travel to the United States, laundering the money they took from elderly Americans, and distributing the money to co-conspirators. Conneh and his immediate co-conspirators took at least $408,000 from approximately 20 elderly victims of the grandparent scam. The government asks the Court to impose a sentence commensurate with the low end of the applicable sentencing Guidelines.

## I. THE GRANDPARENT SCAM

The grandparent scam is a telemarketing fraud scheme involving phone calls made to elderly individuals. The initial callers typically pose as a member of the elderly victim’s family (usually a grandchild) and claim – falsely – to be in legal trouble, such as a motor vehicle accident. A second person posing as an “attorney” representing the family member then states that the elderly victim of the scam needs to provide a large sum of cash – typically thousands or tens of thousands of dollars – to bail the family member out of jail. The attorneys involved in this scam often identify themselves by various fictitious names, which sometimes are re-used in

connection with calls to multiple elderly victims. The elderly victim is then instructed to provide the "bail money" to a "bail bondsman" who comes to the elderly victim's home later the same day. The attorney then gives the elderly victim specific instructions about how to withdraw money and package it in an envelope for the bail bondsman. Additionally, the attorney advises the elderly victim that there is a "gag order" in effect that prohibits the elderly victim from discussing the matter with anyone, noting that doing so could compound the family member's legal trouble.

The scheme begins at call centers – sometimes referred to as "boiler rooms" – in and around Montreal, Canada. Call centers can be located in various locations, including warehouses, office buildings, residences, condominiums, or rental properties. Multiple affiliated call centers may operate simultaneously. Each call center is typically made up of multiple individuals, including a "manager," several "openers," and a "closer." The openers pretend to be a relative – often a grandchild – of the prospective victims they call. These openers place numerous calls to victims in a day, many of which are unsuccessful. When an opener has successfully deceived an elderly victim, the opener passes the call off to the closer who plays the role of the attorney representing the victim's purported grandchild. Closers tend to be more experienced than openers and often have graduated from the opener role. A manager may also be present in the call center and is usually responsible for logistics, such as making sure the telephones used by the call center are ready each day. The manager also controls the "leads" – personal identifying information of elderly individuals in the United States purchased by the call centers for cents per lead. Call centers are often owned and controlled by individuals who are not on the premises. The owners of the call centers are frequently affiliated with Italian organized crime.

Call centers often have financial arrangements with "money collection teams" that are responsible for collecting proceeds of the scheme directly from the elderly victims and in turn receive a certain percentage of the profits of the scheme. A money collection team often consists of a recruiter/organizer, known as a "casher," and several bail bondsmen. While the casher is relatively consistent, the bail bondsmen often change – sometimes by the week – given their fungible role and the increased risk of arrest in light of their front-line activities. Call centers sometimes work with multiple money collection teams simultaneously.

When an elderly victim has been convinced that their relative is in legal trouble and is ready to pay the bail money, the call center sends a message containing the victim's name, address, and the amount of bail money to a casher. After receiving a victim's information from the call center, the casher sends a message – typically using an encrypted messaging platform such as Signal, Telegram, or Wickr – to a bail bondsman, who is responsible for picking up the bail money from the elderly victim.

Bail bondsmen are dispatched by the cashers to a different location each week and are often instructed to travel to a particular city or state several days before they are to begin work each week. These locations are chosen because the call center has obtained leads for numerous victims in these locations and therefore intends to call a significant number of victims who all reside in this particular location. Bail bondsmen typically work from Monday to Friday during normal business hours and then return home, or travel to the next location selected by the call center. The weekly change of locations is intended to evade law enforcement. Bail bondsmen often stay at hotels and/or Airbnb's for up to a week at a time in the general geographic area of victims to whom calls will be made. The scam usually limits its operation to normal business hours to increase its legitimacy given that U.S. courts (and banks, from which elderly victims

may need to obtain significant amounts of cash) only operate during these same hours. Because bail bondsmen may be some distance from a particular elderly victim's residence when they receive the elderly victim's address from the casher, the bail bondsman provides an estimated time of arrival to the casher. The casher then relays this information to the call center and the closer in turn informs the victim how long it will be before the bail bondsman arrives at the victim's residence.

Sometimes bail bondsmen or employees of the call center become suspicious that an elderly victim may have alerted law enforcement to the scam's efforts to defraud them. To avoid the arrest of the bail bondsman and seizure of the proceeds of the scam by law enforcement, the closer tells the elderly victim to package the cash inside a book or magazine and mail it to a specific address. These packages are commonly referred to as "packs." The address provided to the victim is a pre-selected location – usually an empty house – that has been scouted in advance. This scouting is typically done by members of the money collection team who look at an online real estate marketplace to find homes which appear to be vacant based on the absence of furniture depicted inside the residence. The casher often sends a co-conspirator to the residence in advance to ensure that it is vacant. A co-conspirator is responsible for retrieving the "pack" once it has been delivered. "Pack" addresses are typically sent by the money collection team to the call center at the beginning of each work week.

After a bail bondsman collects a significant amount of money from multiple victims, the bail bondsman is instructed to bring the money either to the casher or to an individual who operates a "safe house." Bail bondsmen may be directed to drop cash to the safe house more than once in order to mitigate the amount of money that could be seized by law enforcement in the event a bail bondsman is arrested. The operator of the safe house may collect money from

multiple bail bondsmen during the course of a week. The safe house can be a stationary location like a residence, or can be a mobile vehicle driven by someone who typically follows bail bondsmen in close proximity. After collecting the proceeds of the scam, the casher or the operator of the safe house brings the money to a person capable of sending the fraud proceeds back to Canada. This person often has the ability to exchange the cash proceeds of the offense and for an equivalent amount of cryptocurrency, which is sent to individuals in Canada.

## II. CONNEH'S OFFENSE CONDUCT

Conneh participated in this grandparent scam by recruiting a "bail bondsman," supervising the bail bondsman, facilitating communication between his co-conspirators, and paying his co-conspirators once the proceeds of the scam were laundered back to Canada. Conneh and his immediate co-conspirators took at least $408,000 from approximately 20 elderly victims of the grandparent scam.

## III. UNITED STATES SENTENCING GUIDELINES

### a. *Guidelines Applied by the Presentence Investigation Report*

The Presentence Investigation Report ("PSR") applies the following Guidelines:

| | |
|---|---|
| 7 | Base Offense Level – § 2B1.1(a)(1), |
| +12 | Loss Amount – § 2B1.1(b)(1)(G) |
| +2 | 10 or More Victims – § 2B1.1(b)(2)(A)(i) |
| +2 | Scheme Outside U.S – § 2B1.1(b)(2)(A)(i) |
| +2 | 18 U.S.C. § 1956 Conviction – § 2S1.1(b)(2)(B) |
| +2 | Sophisticated Laundering – § 2S1.1(b)(3) |
| +4 | Large Number of Vulnerable Victims – §§ 3A1.1(b)(1), (b)(2) |
| +3 | Aggravating Role – § 3B1.1(b) |
| -3 | Acceptance of Responsibility – § 3E1.1 |
| 31 | Total Offense Level |

In conjunction with Criminal History Category I, the Guidelines imprisonment range set forth in the PSR is 108 to 135 months. The PSR notes that if Conneh's Canadian convictions were

counted for purposes of his Criminal History Category, the Guidelines imprisonment range would be 121-151 months.

As detailed further below, the government believes that an additional two-level enhancement should apply pursuant to USSG § 2B1.1(b)(3) because the offense involved theft from the person of another. Application of this enhancement would result in a Guidelines imprisonment range of 135-168 months, or 151-188 months if Conneh's Canadian convictions were considered.

b. *The Government's Objection (USSG § 2B1.1(b)(3) – Theft from the Person of Another)*

The government respectfully asks the Court to apply an additional two-level enhancement pursuant to USSG § 2B1.1(b)(3), which applies "if the offense involved theft from the person of another." Unlike certain Guidelines which apply only to the defendant, USSG § 2B1.1(b)(3) applies to the "offense" (pursuant to both § 1B1.3(a)(1)(A) and § 1B1.3(a)(1)(B)). The Commentary to the Guideline defines "theft from the person of another" as "theft, *without use of force*, of property that was being held by another person or was within arms' reach." USSG § 2B1.1 comment. n.1. The bail bondsman who Conneh recruited and coordinated with repeatedly took money directly from the hands of elderly individuals. This conduct constitutes "theft" for purposes of the Guidelines – there is no dispute that Conneh's base offense level should be calculated pursuant to § 2B1.1, which is titled "Larceny, Embezzlement, *and Other Forms of Theft…*" (emphasis added). Moreover, Conneh's offense conduct was perpetrated "without the use of force" and the money taken was "being held by another person." As such, Conneh's conduct fits squarely within the plain text of § 2B1.1(b)(3).

The Commentary to § 2B1.1 provides non-exhaustive, illustrative examples of qualifying conduct, including "pick-pocketing and non-forcible purse-snatching, such as the theft of a purse

from a shopping cart." USSG § 2B1.1 comment. n.1. Conneh's offense conduct is akin to pick-pocketing in that it involves the taking of property in a manner in which the victim may not be immediately aware that theft has occurred. In Hanhardt, the Seventh Circuit upheld the application of § 2B1.1(b)(3) where "a traveling jewelry salesman was distracted by a bump from behind" and "[s]hortly after, he realized his briefcase, containing his $1.3 million jewelry line, was gone from the floor by his side." United States v. Hanhardt, 361 F.3d 382, 392 (7th Cir. 2004), cert. granted, judgment vacated sub nom. Altobello v. United States, 543 U.S. 1097 (2005). For purposes of § 2B1.1(b)(3), there is little daylight between the nature of the theft in Hanhardt and Conneh's offense conduct here – each involved the non-forcible taking of property directly from the person of another.

The Background to the Guideline explains that "theft from the person of another…receives an enhanced sentence because of the increased *risk* of physical injury." There is no requirement that the risk be realized – rather, the Guideline is aimed at the risk inherent to theft that occurs in directly from another person. In fact, were the risk of physical injury to be realized, it is likely that the Guideline would no longer apply given the requirement that the offense be perpetrated "*without* the use of force." "The case law on this particular guideline…is consistent with the view that the guideline targets physical and therefore potentially violent (even if non-forcible) forms of theft." United States v. Pizarro-Berrios, 448 F.3d 1, 11 (1st Cir. 2006) (citing United States v. Rizzo, 349 F.3d 94, 98, 100 (2d Cir. 2003); United States v. Londono, 285 F.3d 348, 350–51, 353–54 (5th Cir. 2002); United States v. Jankowski, 194 F.3d 878, 885–86 (8th Cir.1999).

In Londono, the Fifth Circuit noted that "the announced purpose of this enhancement is to dissuade and punish the kind of direct or near-direct physical interplay between the perpetrator

and the victim that has the potential of leading to the injury or even the death of the victim." 285 F.3d at 353. The direct physical interplay between a pickpocket and victim is identical to the direct physical interplay between a bail bondsman and victim here. Moreover, the risk of violence inherent to the interaction between a bail bondsman and victim has been realized during the perpetration of this precise grandparent scam.[1]

The Second Circuit has found that § 2B1.1(b)(3) applies where the "offense involved theft, without use of force, of property that was being held by another person or was within arm's reach of that person." United States v. Rizzo, 349 F.3d 94, 100 (2d Cir. 2003). Conneh's offense conduct satisfies the Second Circuit's standard, which, like other Circuits, does not include any exception for fraud or deceit. While several appellate courts have identified circumstances in which the enhancement should not apply, their focus has been on whether or not the property stolen was within arm's reach of the victim. See id. (noting that "the defendant could have bought the stolen property from someone or found [it]"); Londono, 285 F.3d at 353 (declining to apply enhancement because the defendant "was approximately ten feet away from the diamond case at the moment of its theft" and thus the property was not "within arms' reach"); United States v. Pizarro-Berríos, 448 F.3d 1, 10-11 (1st Cir. 2006) ("the guideline is intended to apply to physical takings, not to abstract forms of theft that take place far from the victim, like credit card fraud").

There is no dispute that Conneh's offense conduct involved the repeated taking money directly from the hands of elderly victims and thus none of the concerns identified by appellate courts are present here. Accordingly, Conneh should receive a two-level enhancement pursuant

---

[1] (See https://www.nbc4i.com/news/local-news/central-ohio-news/ohio-uber-driver-sent-by-scammer-killed-in-shooting/

to USSG § 2B1.1(b)(3) based on his offense conduct involving "theft from the person of another."

c. *Conneh's Objection #1 (USSG § 3S1.1(b)(3) – Sophisticated Laundering)*

Conneh does not dispute the fact that proceeds of the grandparent scam were converted to cryptocurrency, then converted to Canadian dollars, then loaded onto prepaid debit cards, which were added to PayPal and were used to distribute the proceeds to co-conspirators. Nor does Conneh dispute that this series of transactions constitutes "two or more levels of transactions, transportation, transfers, or transmissions, involving criminally derived funds that were intended to appear legitimate." USSG § 3S1.1(b)(3). Rather, Conneh merely suggests that his personal involvement in this series of transactions was limited to the purchase of prepaid debit cards, added to PayPal, and the use of PayPal to distribute proceeds to co-conspirators. Contrary to the stipulated facts in the plea agreement, Conneh suggests that other layers of this series of transactions were not reasonably foreseeable to him.

Conneh's argument fails to reckon with the evidence from his own iCloud account. While it is true that Audate – not Conneh – was responsible for aggravating proceeds and converting the U.S. dollars to cryptocurrency in New York, Conneh undoubtedly aware that a co-conspirator was fulfilling this role. See PSR ¶ 22(c) (discussing the "safe house guy"). Moreover, in the midst of Conneh's offense conduct, he sent a text message to another individual asking if he had a "guy in New York" for "large amounts of cash." PSR ¶ 24(e). Further, Conneh was involved in cryptocurrency transactions, PSR ¶ 24(f), and was personally involved in planning for the smuggling of bulk currency from the United States to Canada, PSR ¶ 22(a), (b). Finally, Conneh explicitly stated that he was responsible for the money while it was transported by co-conspirators. PSR ¶ 21(e). As a result, there should be no question that the

various layers of the sophisticated laundering of the proceeds of the grandparent scam were reasonably foreseeable to Conneh, and a two level enhancement should be applied pursuant to § 3S1.1(b)(3).

d. *Conneh's Objection #2 (USSG § 3A1.1(b)(1) and (2) – Vulnerable Victims)*

Conneh objects to the PSR's inclusion of a four-level enhancement pursuant to USSG § 3A1.1(b)(1) and (2) based on the large number of "vulnerable victims" involved in his offense. He appears to contest only the applicability of § 3A1.1(b)(1), and indirectly challenges the application of § 3A1.1(b)(2) because § 3A1.1(b)(2) only applies if § 3A1.1(b)(1) also applies. Conneh "eventually became aware" that he was participating in a grandparent scam involving elderly victims, and that he continued to participate in the scam with this knowledge in hand. See PSR ¶ 18(a). Conneh knew exactly how the scam worked – he knew about the call centers, he knew about the "leads," and he knew that the "bail bondsmen" who traveled to the United States would be taking money from the elderly. See id. He knew that participants in the grandparent scam are considered by his associates in Montreal to be "immoral and unscrupulous." He participated anyways, and now claims that he did not know or have reason to know that these elderly victims were "unusually vulnerable." He further fails to acknowledge his experience with unusually vulnerable elderly victims: his 2013 conviction in Canada – discussed further below – also involved the exploitation of the elderly.

Conneh's awareness of the victims being elderly is in and of itself sufficient – the reason the scheme targeted only the elderly was due to their inherent susceptibility to the scheme. See United States v. O'Neil, 118 F.3d 65, 75 (2d Cir. 1997) ("although being elderly is alone insufficient to render an individual 'unusually vulnerable' within the meaning of 3A1.1(b)…courts frequently have found elderly individuals to be unusually vulnerable to

telemarketing fraud schemes very similar to the one involved here"). Moreover, that the success of the scheme in and of itself provided Conneh with actual knowledge of the vulnerability of the elderly victims. As a result, even if Conneh did not have actual knowledge that the elderly victims were "unusually vulnerable," the Court should find that Conneh *should have known* the elderly victims were unusually vulnerable. See USSG § 3A1.1(b)(1) (applying to defendants with constructive knowledge).

e. *Defense Objection #3 (USSG § 3B1.1(b) – Aggravating Role)*

The government does not oppose a 2-level enhancement pursuant to USSG § 3B1.1(c), rather than the 3-level enhancement set forth in the PSR. There should be little doubt that, at the very least, a 2-level enhancement applies based on the stipulated facts in the plea agreement. See PSR ¶ 18(b), (c), (f).

IV. SENTENCE RECOMMENDATION

The grandparent scam in which Conneh participated is designed to exploit the love and concern that grandparents feel for their grandchildren. By causing elderly victims to worry about the well-being of their grandchild, placing pressure on them through the "urgent" need for bail money to be provided, and isolating them through a sham "gag order," the scam induces elderly victims to part with thousands, and sometimes tens-of-thousands of dollars. The emotional distress elderly victims feel is not an unintentional by-product of the grandparent scam – rather, it is an essential component: the more distressed the victim, the more likely they are to provide the supposed bail money for their grandchild. The grandparent scam has proven to be highly effective – the government's investigation has determined that over the course of just 67 weeks, the grandparent scam in which Conneh participated took over $21 million from elderly victims across the United States.

The grandparent scam causes elderly victims to feel embarrassed, taken advantage of, less safe in their homes, and less trusting – even of legitimate phone calls from their grandchildren. Conneh was willing to cause these harms to satisfy his greed and his desire to "get ahead," and his laundering of the proceeds of the scam perpetuated the scheme, causing untold harm to other elderly victims. Aside from children, there are perhaps no more vulnerable victims than the elderly. Many of the victims of this grandparent scam are in their 80s or even 90s. Had Conneh taken hundreds of thousands of dollars from a bank vault, his conduct would be considered exceptionally serious. The fact that he instead took the money from the hands of his elderly victims should be viewed as comparatively more serious.

Conneh's suggestion that he was an "inconsequential" (Doc. 41 at 1) component of the grandparent scam is preposterous. A direct line can be drawn between Conneh's conduct and substantial economic and emotional harm to approximately 20 elderly individuals. Conneh suggests that he deserves a "second chance" (Doc. 41 at 3) without acknowledging that he has already received a second chance. In 2013, Conneh was convicted of fraud over $5,000 and ten counts of identity theft. His offense involved his exploitation of the elderly by co-opting their bank accounts. Facing a 16-month sentence of incarceration, he was given a "second chance" and was placed on house arrest so that he could attend college.

Thereafter, there is reason to be skeptical of Conneh's assertion to the United States Probation Office that he was "self-employed in clothing imports and sales from 2006 to 2020." PSR ¶ 68. When Conneh recruited a co-conspirator to participate in this grandparent scam, Conneh's mutual friend – a correctional officer at a maximum security federal prison – reported that he had been "working" for Conneh for ten years. For the past decade, Conneh has been able to fund extravagant travel and wear a Rolex watch. He visited the Dominican Republic,

Columbia, Peru, El Salvador, and Mexico – in a social media post, he stated "9 countries, 37 flights, 24 cities in 2024." Conneh's own statement attached to his sentencing memorandum indicates that he has been to Costa Rica *18 times* since 2018. The picture Conneh paints of himself as an otherwise law-abiding individual who made a one-month mistake does not match his history.

Moreover, after Conneh's participation in the grandparent scam ended, he immediately began managing a "cross-docking scam" in which good purchased with stolen credit card information was shipped through the United States through short-term transfer facilities where the cargo was "laundered" by breaking the traceability of the shipments. The goods were sold for profit once they were transferred to Canada. Conneh worked with co-conspirators in both Canada and the Philippines, and was in China – where he claims to have run a "legitimate" importation business – while participating in this scam. The government believes that Conneh's "business" activities include trade-based money laundering, whereby goods were purchased in China with criminally derived funds, and then were shipped to Canada where they were sold for "clean" profits.

The government does not dispute Conneh's account of the time he spent in custody in Costa Rica. A countervailing consideration, however, is the reality that – as a Canadian citizen with no legal status in the United States – the Court will be unable to supervise Conneh when he is returned to Canada. The lack of a practical term of supervised release, and the corresponding inability to enforce restitution obligations, should offset any reduction in sentence for the time Conneh was detained in Costa Rica.

V. CONCLUSION

For the reasons set forth above, the government respectfully asks the Court to impose a sentence commensurate with the low end of the applicable sentencing guidelines.

Dated at Burlington, in the District of Vermont, October 1, 2026.

Respectfully submitted,

UNITED STATES OF AMERICA

JONATHAN A. OPHARDT
First Assistant United States Attorney

By: */s/ Nathanael T. Burris*

NATHANAEL T. BURRIS
Assistant U.S. Attorneys
P.O. Box 570
Burlington, VT 05402-0570
(802) 951-6725
nate.burris@usdoj.gov